Good morning, Your Honor. May it please the Court, Reese Bader on behalf of the Petitioner, Stephen Bronte Advisors. This case, this petition comes before you. You know, I'm sorry, Mr. Bader. We'll wait till the clock sets up. This is not your problem. But it'll be easier if we wait for that to set up. I apologize. No, it's not your fault. Nobody's fault. We'll just get it set up and then we can go. You should start at 20, not 22. There you go. Okay. There we go. Okay. Thank you. Let's start over. Here we go. All right. May it please the Court, Reese Bader on behalf of the Petitioner, Stephen Bronte Advisors. This petition arises, of course, from the CFTC order revoking Mr. Bronte's two licenses under the Commodity Futures Act based on what the commission believed was perjured testimony by Mr. Bronte in an unrelated State court child support proceeding. And a nonjudicial membership organization of the National Futures Association, which enforces a number of the CFTC's rules and regulations, reviewed portions of testimony from a two-day hearing, determined that Mr. Bronte had lied under oath, i.e., committed perjury, the CFTC summarily affirmed, and Mr. Bronte's licenses were revoked. Now, there are a number of things, I think, that are important. One is this action was precipitated not by a customer complaint, by some trading violation, by some breach of the Act, but rather by the other party in the State custody court State support proceedings, the individual with whom Mr. Bronte had had a relationship some 15 years before. The CFTC's authority for what we have argued in our brief is unprecedented action is not the Act itself, but rather an interpretative statement and guideline. Do you concede that the member made a perjurous statement? No, I do not, Judge Beeson. Made a false statement. No, we do not. And that's what the hearing was designed to determine, right? The charge was, the initial charge was, that Mr. Bronte had lied under oath. And the specific... That's perjury. Exactly. And that's we don't see that there's really any. I mean, that is a perjury charge, I think, plain and simple. Yeah. And that's one of the reasons why none of the, as we've argued for a number of reasons, none of the traditional safeguards one would have with respect to that determination were present. It was in an expedited proceeding as to which the defenses were simply the way the defenses work in an expedited proceeding is it presumes there's already been a prior determination of some kind, judicially or otherwise, of whatever the statutory disqualification offense is. If this proceeding had... We do a lot of these things in a similar fashion in the legal profession, where you have a trade association like the American Bar Association or the American Medical Association and they conduct disciplinary proceedings against the lawyer and then a Supreme Court in some state gets wind of it and bingo, the license is gone based on what the trade association did. We do, Judge Beezer. That's just about what you've got here, isn't it? But the difference here, the difference here is that in 1982, when Congress made substantial amendments to the Commodity Futures Trading Act, it specifically delineated in a number of categories what Congress intended to be statutory disqualifications, including convictions for felonies, misdemeanors. It specifically denominated what they were. And then it put in an other good cause. It's our position that what the commission has done with respect to the other good cause runs contrary to that congressional intent. And I think there's a difference when you have that kind of a statute and that kind of congressional intent. Kennedy. But what if the member filed a false tax return and the Internal Revenue Service went after him and there was a determination that there was just a civil proceeding for collection of the correct amount of tax and no criminal conviction? Would that be other cause? No. I would make the same argument that we do here in that particular case. And that's what led to the Internal Revenue dispute? I'm sorry. If he cooked the books in his trading office and that's what led to the Internal Revenue dispute, would it be sufficient? Well, now you're getting closer because you're getting closer to the actual. I'm trying to draw a line here. You are, too. Well, I am. The line I'm drawing is simply that what the commission did here essentially was not what Congress intended it to do. And what they basically have done, have taken Article III powers. Okay. Let's step back. Congress says this is other cause. And if you go to the Chevron v. Natural Resources type case, the administrative agencies have some leeway within the statutory prescription to establish and define the conduct. I don't. I don't dispute that. You don't agree with that? No. I don't dispute what you just said. But we don't think Chevron is applicable. The deference that Chevron entitles an agency to is not applicable here for a number of reasons. First of all, unlike Chevron, the interpretation here was never subject to the typical notice and comment. It didn't go through the rulemaking process. It didn't go through the rulemaking process. So there's nothing on the books of the agency that would alert a trader that lying in civil affairs was a revocable offense. That's right. And every time, every time it has been interpreted by the CFTC until this very case where they have come in with other good cause has been predicated on either a specific finding and determination by a judicial body or a specific finding and determination in another administrative body that is then carried over. You don't have that here. What happened here is that everything is put into this particular proceeding. And our first ---- This standard is maybe one step better than the Supreme Court standard. You'll just conduct yourself as a gentleman, and all the ladies are excused. So they're not even covered by the rule, and yet they just bar women. And Mr. Bronstein's licenses were revoked in this particular case for this very, you know, for this very reason. Let me come back as to the thrust of the positions that we've taken here. And I think I've indicated why we don't believe that Chevron applies and that you should look at it in terms of the Mead and the other line of cases. And in doing so, while respect is awarded an agency where it's appropriate, we think given all the circumstances here, they're not entitled to that respect. I've already talked generally about the congressional intent. We indicated in our brief exactly what we think Congress intended. In fact, one of the specific purposes in 1982 was to get away from the ambiguities that had previously existed with respect to this disqualification of registrants and to come up with some cover. Another good cause? Eliminate ambiguity? Oh, I don't think it does, Judge Halligan, at all. And particularly. That's what Congress said. They did. They did. But if your question is by saying, all right, isn't other good cause, doesn't that mean the CFTC has the right to determine what establishes other good cause? And my answer is not in this particular case. And the reason for that is the ‑‑ I'm not good at the Latin, but the exclusion of one thing, or the expression of one thing is the inclusion of the others. And here, when you look at the legislative history that we've quoted in our brief, there was specific language as to what Congress intended on the statutory disqualifications. And that has significance here, because I think what that means when you look at the entire scope of the section, other good cause really should not be interpreted outside the context in which Congress adopted the statutory disqualification. And what are the listed causes to which other good cause is appended? I'm sorry, Judge Fletcher? And what are the listed causes to which other good cause is appended? If you look at the entire scope of the interpretive statement, it discusses a number of different things all related to the business ‑‑ the commodities future activities of a registrant. And then at the very conclusion of the regulation, of the interpretive statement, after about three or four pages, it says, the listing, of course, is not exclusive, but in effect, the commission is interpreting this paragraph to authorize it to affect the registration of any person if, as a result of any act or pattern of conduct attributable to that person, though never in the lack of honesty or financial responsibility. That's the only time lack of honesty is referenced in this particular part of the interpretive statement. And yet that's the little phrase that they're proceeding under. And are you arguing somehow that the Commodities and Futures Trading Commission cannot go beyond sort of, as it were, financial misfeasance into, I guess I'll say, personal affairs? I am. I am. Had there been ‑‑ And so what happens if, for example, he's a murderer and is convicted of a felony? The CFTC does not have the power to ‑‑ Oh, of course they do, because that's a statutory disqualification. That's a felony in one of the enumerated. If Mr. Bronte ‑‑ In other words, your Euston Generous argument, and I don't think it's exclusive or ulterior, I think it's a Euston Generous argument. Well, it's the other way. Okay. But it's the same thing. Had Mr. Bronte been prosecuted by the district ‑‑ Let me finish. Okay. That is to say, your Euston Generous argument, then, doesn't say that the listed offenses are all with respect to finances. Some of them are with respect to other behavior unrelated to the actual conduct of the business. Yes, they are. Okay, there we go. That's correct. And, you know, I wouldn't be here today if, for example, the district attorney who sat through these support proceedings had determined that Mr. Bronte was untruthful and had brought a perjury prosecution in Marin County, and Mr. Bronte had been convicted by a jury in that perjury prosecution, obviously then that would fit right within one of the statutory disqualifications, conviction of a felony. This type of proceeding undoubtedly would have been appropriate. So the question, then, is not that this behavior is not sanctionable and this behavior, then, is not something that will allow him to be disqualified. You're just hinging upon whether we have a criminal conviction for the behavior. I'm not disputing that this type of conduct, had it been determined as it otherwise would have been determined in the criminal context, certainly would have been a basis for revocation of the two licenses. But you're saying the CFTC. What I'm saying is you can't do it in this kind of a proceeding. The CFTC is not a fact finder? Is that the problem? In this kind of a proceeding, that's correct, because what they have done essentially is usurp their authority, and they have basically taken the equivalent of Article III authority. The determination of lying under oath, really a perjury determination, is a judicial function. Now we have three non-lawyer members of the NFA undertaking on their own to make that determination in an expedited proceeding with a limited defense. That is where we see not only unreasonable and outside the scope of the statute, but clearly raises, at least poses, serious constitutional issues. I'm trying to be sympathetic to your client and help me understand why the nature of the limitations on the defense. So you say with a limited defense. I mean, why is he not able to argue fully why he should not be found to have committed perjury? Well, let me answer that in two ways. First of all, the limited nature of the defense. The charge was that Mr. Bronte had lied under oath. The charge changed during the course of the proceedings, but be that as it may, which we think is also a due process issue, that under the regulations, the defense that you have in an expedited proceeding is limited to five issues. Identity, that wasn't an issue here. A clerical error in the record documenting the statutory disqualification. There hadn't been any statutory disqualification. The nature and the date of the disqualification, that hadn't occurred. Post-conviction, not applicable. Favorable disposition on appeal, not applicable. Now, so that limited defense. How about not true? Is that a defense? Mr. Bronte testified at the hearing, as did his lawyer who represented him in the support proceedings. And so he was provided, I don't dispute, that he didn't have an opportunity to respond. He did, in fact, respond and explain. But we did so in the context of mitigating factors, which the commission's rules recognize can be a part of the proceeding. But then what happened with respect to the mitigation, and the mitigation related to Mr. Bronte's physical and mental condition at the time, I think the record is very clear that he had just come out of the hospital at the time of the April 99 hearings, having had a serious blood disorder as a result of some of the treatments and the tests that had gone on for prostate cancer. He subsequently was undergoing treatment out of the country for a period of time. All of those events that we did bring forth, and his lawyer's comment that he was under medication at the time of the hearing, that he had difficulty communicating with him, that sometimes he was out of it, together with Mr. Bronte's explanation of, and consistent, no, I believe those answers to be true at the time I made them in the April hearing. All of that, we did have an opportunity to present that. What happened, though, is, and if you look carefully at the order of the NFA that was affirmed, what the order says is we're not going to, and I'm going to quote, since Bronte maintains there was no wrongful conduct, he has no basis for claiming mitigation. Therefore, the subcommittee gives no weight to Bronte's mitigation evidence. Now, that ---- I'm sorry. Can you just read that one more time? I slipped a cog as I was listening. Since Bronte, this is in our appendix 4, page 18. Since Bronte maintains there was no wrongful conduct, he has no basis for claiming mitigation. Therefore, the subcommittee gives no weight to Bronte's mitigation evidence. Now, that ---- In other words, he can't say I didn't do it, and if I did do it, it wasn't so bad. That, I, exactly. I mean, what I understand that to say is before I can say I didn't do it or here's an explanation as to why my answers were truthful or here's an explanation that, as my lawyer said, I wasn't entirely with it on that particular day, I, Mr. Bronte, have to say I lied. Okay. Now the panel can consider that. It strikes us, for the reasons that we've stated in our brief, that that type of procedure shouldn't be countenance. I see my time is running. Let me just close briefly. We have a lot of materials we've submitted, including those transcripts. But basically, Mr. Bronte's registration is shut down because of this particular event. And the irony, the irony of the entire thing is that the CFTC does so despite undisputed evidence that Mr. Bronte's actions in the course of his registrations, and he's been in the business for 27 years, had not harmed a single customer. There had been one customer complaint which he personally satisfied out of his own funds. Throughout the entire point of his registration, he was in compliance. He had demonstrated an ability and desire to act in accordance with principles of trade. He made every effort to deal with his clients. And when the NFA came in to conduct the audit, as a result of Ms. Winter's complaint about Mr. Bronte, they found that his activities as a CPO and a CTA were in compliance with every CFTC rule and regulation, with a couple of minor exceptions. And what happens? He gets barred from the industry. That not only substantially impacts Mr. Bronte and his livelihood, but if the commission is able to stand on its interpretive guideline and that guideline is approved, it not only impacts Mr. Bronte, but it impacts virtually every registrant. Because under the commission's theory, they can, as in this case, police any particular statement. If they don't like those statements, they can use those statements to revoke licenses for dishonesty or anything else they may choose to add to their interpretation. And accordingly, we think the order should be reversed and Mr. Bronte's licenses should be reinstated. And I'll save the remaining minute or so for rebuttal, Judge Fletcher. Thank you. May it please the Court. My name is Gabrielle Sudik, and I am representing the Commodity Futures Trading Commission. The commission asks this Court to affirm the order revoking the registrations of Stephen Bronte Advisors. Congress authorized the commission to deny or revoke the registrations of a person with the commission when there is good cause.    The commission also authorized the commission to deny or revoke the registrations of a person with the National Futures Association, which is the self-regulatory body authorized to perform registration functions on behalf of the commission, found after a hearing that Mr. Bronte had engaged in a sustained pattern of dishonesty under oath concerning his work as a registered commodity trading advisor and commodity pool operator. Notable. Injured by this? Well, the statutory scheme for registration. No. Who was injured by the statement made by Bronte? True or false? I don't care. He made a statement that the commission relies on. Who was injured by that statement? There's the possibility that there was injury. Possibility? I mean, does the record tell me who was injured? Was there an injurious reliance on a false statement? There does not appear to be, but that our scheme is enacted in part to help prevent future industries. So this isn't like 1001 where we're making false statements. Somebody must be the government relies on a false statement. I think so, Your Honor. Section 803 of our act sets forth many factors. It's designed to protect the public, is it not? Yes, that's correct. And nobody in the public was injured by a statement made by this member, right? And now you've jerked his license in which he has some kind of a substantial interest for earning a livelihood so he can pay his child support or divorce alimony or whatever else he owes, right? Many of the statutory disqualifications don't require showing that somebody was harmed, but they do raise a presumption that the person is unfit to work in the industry. Well, I asked who was injured, and the industry wasn't injured either. There's no showing of that. No, Your Honor. You know, I don't know whether you ever did any domestic relations work. There's a lot of things said between husbands and wives that are separated and separating and having marital disputes of one kind or another. And they get nasty. And people push the button pretty far sometimes in terms of agitating the former partner. And this being the cause for revocation of a business license, in essence, is rather the agency trying to do is protect people from injury. Yes. And so I don't get it why it even constitutes cause, much less other cause. In response to that, again, many of the factors in 8A3 or 8A2 don't necessarily show that there was harm to a particular customer or to a customer, but they raise a presumption that the person should not be registered with the commission. And in this case, it wasn't just casual comments between a husband and wife. It was comments that Mr. Bronte was violating the Commodity Exchange Act, and he made them in a forum where he was unnoticed that, you know, honesty is paramount. Okay. It was in connection with domestic relations work, though, right? He was not selling commodities or dealing in commodities or entering any business transaction involving commodities that were subject to regulatory control. The statement was that the commission had nothing to do with his divorce case, did it? That's right. The commission is not interested in the child support hearing, but the commission is interested in statements he makes indicating that he is violating the Act. So the argument is he's making statements in a child support hearing that are not true. Correct? Correct. And because he made statements in a child support hearing that are not true, he loses his license. That is correct, because one of the factors that allows license revocation is other good cause. And the commission is consistently ---- There's an awful lot of really bad people out there. Why don't you go find them? Do you mean? I didn't understand. I'm not in the business of telling the Commodities Futures Trading Corporation what its business is. Commission. Commission. But there's a ---- And I'm not in the business of saying that he did a good thing, and I'm not yet in the business of saying that it acted beyond its power. But there are a lot of ---- there's a lot of financial misfeasance, as we all know, and this does not strike me as part of it. Well, this case started when the National Futures Association was given copies of the transcripts. And the statements he made in there caught ---- This is Grenell Dwight. Like any investigatory agency, the NFA, you know, finds wrongdoing by audits and by complaints from others. It can be customers. It can be other people. In this case, he had said he had used customer funds to pay a personal judgment. That's a violation of the Act. He had said he was not keeping books and records on his commodity pool. That's a violation of the Act. At this point, the NFA was obligated to look into Mr. Bronte's activities and find out if these statements were true. And when it discovered that those statements were not true ---- In other words, he ---- In other words, in the child support hearing, he testified that he was violating the regulations. They then investigated the discoveries not violating the regulations, but then they come after him for lying. That's correct. Oh, boy. Okay. So they find out that, in fact, he's complying with the law, but he lied. Well, he was complying with other provisions of the Act, but there was still good cause to revoke his registrations ---- Five. ---- based on what the commission has consistently interpreted as a phrase to me. Does it look like you guys are going after him? I don't think so, Your Honor. No. Any other complaints during 28 years of licensure? Well, he's only been registered with the commission since 1994, and I do not believe that there have been any other complaints with our commission regarding Mr. Bronte. So ---- But because ---- Now, remember, it was Congress who included other good cause in the statute and did not define what good cause meant. And ---- And it kind of, in parenthesis, is written, Well, in this case, NFA was limiting its inquiry into something directly related to Mr. Bronte's work as a trading advisor. It was not investigating whether he told a fib in kindergarten. So the commission ---- But when they revealed that that was a ---- when they discovered that that's, in fact, all it was, was a lie during child support proceedings, and that, in fact, he had, as far as I can tell, he had not really violated the financial rules applicable to him, they still decided they were going to get him. Wrongdoing to revoke registration does not have to rise to the level of financial wrongdoing. For instance, a false statement on somebody's application to be registered can be grounds for revocation. The thing that's troublesome is Congress gives the commission some authority. And now, does specific ---- are specific regulations adopted lying in a civil court proceeding constitutes a revocation of license item? Is there anything like that that he would be able to read or understand that was delivered to him by the commission as part of its regulatory operations? The commission has phrased it as lack of honesty, and that's included in Appendix A to Part 3 of our regulations. In dealing with the paperboy or the neighbor or anybody else or the used car salesman, any ---- any dishonesty with respect to anybody, right? Is that what the commission adopted, a rule that says? On its face, it only says lack of honesty. It doesn't delineate it further. But its application in this case, again, goes to his work as a registrant with the commission. Well, he didn't ---- he didn't direct this to the commission in response to a request for information or an investigation of the commission. This is directed between a husband and a wife in a domestic relations procedure. And I would add, in a forum, you know, where he's on notice that honesty is paramount and the statements were in regards to his work as a registrant, that is what makes it of interest to the commission. Now, this list of statutory disqualifications, including other good cause, it's part of a greater scheme of the commission. We're charged with protecting customers, protecting the integrity of the futures markets, and judging whether the people who work in this industry are appropriate people to be handling customer funds. Again, many of our registrants are in direct control of customer funds. And the commission has to know that ---- Define appropriate. That's a wonderful standard way of taking people in. A lot of that can be inferred by how the rest of the scheme is set forth. The provisions under 8A2 and 8A3 give, you know, many, many factors which, if a person meets that, the commission can presume that they are not fit to be registered. So that is the starting point. And good cause is an equal factor with the other more explicit factors listed in Sections 8, 8, 3. Well, the commission's interpretation of good cause has been published with its formal rules. And notably, as you know, the commission has interpreted good cause to include lack of honesty. And the commission has repeatedly relied on its interpretation of good cause in its adjudicatory matters. And in these cases, that is where a person would have been able to challenge the commission has still held fast to its interpretation that good cause includes lack of honesty. Now, if I'm registered and I say to my wife, I'll be home at 6, but then I call her from the bar at 7 and I say, I've been held up on business, that's not honest. It's a flat-out lie. And you guys discover that I lied to my wife and I stayed at the bar until 8, I came home and I said, boy, that was a hard day at the office. I mean, can you get me? Mm-hmm. Yeah. Well, obviously, on its face, that is a, quote, lack of honesty. Oh, yeah. I mean, it's not on its face. I mean, you'll go behind it. It's a lie start to finish. So far, the commission has applied its interpretation, you know, on a case-by-case basis. And you mean a standard list? There is no standard? Because they do it on a case-by-case basis? There's no further explanation of what lack of honesty means, if that was your question. But, you know, the commission is guided by what it has written in its interpretive statement, and it's also guided by the fact that its role is to protect the markets and to ensure the fitness of registrants. So its inquiry would be, you know, guided by that guiding principle as well. So your hypothetical, I'll agree, is a much, much grayer area than this case, where the statements were in regards to his work as a commodity pool operator and trading advisor. And maybe I'm wrong here, and please correct me. When the NFA finally figures out what he actually was doing with his customer funds, did it discover? No. What did it discover? What was the sanctionable behavior? NFA had found that he had paid the judgment with his own funds, not with customer funds, as you said. They found that he had been running the pool himself, that he had been conducting the trades on behalf of the Sakura LTD fund, which is the offshore Bermuda fund. So in short, they found that he had not violated the act in the ways that he said he had at the child support. And had he been violating the act at all except for lying about something else? No. I believe there's not a copy of it in the record, but their audit report found five very small record-keeping problems, but nothing that would cause a problem. You kind of get our drift. That is to say, I'm now just speaking for myself. I'm not sure that this panel has the ability to tell the NFA that it couldn't do this. I guess that's the direct question in front of us. But I am sure that this doesn't make a lot of sense, that he used to be spending a lot of energy doing this. That is to say, once you figure out that, in fact, he's running his business properly within the sort of the financial boundaries, and that the only thing he did was to lie so that he wouldn't have to make child support payments to a woman with whom he'd had a previous relationship and a previous child, whoa. We'll find some real criminals. We think that level of behavior, you know, is as egregious as other more specific factors listed in there. Why shouldn't, you know, false statements made in a court of law regarding his work with the commission? You know, that raises red flags. It raised red flags with NFA and the commission as well. So in the commission's view, this type of behavior, you know, is ‑‑ There's something going on that they don't like the fact that in his testimony he said something that would have been a violation of the commission regulations with respect to his behavior, his professional behavior, because it embarrasses them. But then when they find out that, in fact, he was behaving properly with respect to the commission rules, nonetheless, they don't like to be embarrassed because he states in a court of law something that would, in fact, be a violation of the commission's rules with respect to his financial arrangements. There's nothing in the record indicating that NFA was motivated by a sense of embarrassment. Well, I'm trying to figure out what did motivate them, I have to say. And if we get right down to it, and the only thing wrong is that in a child support proceeding he told a lie, well, you know what? You've got a lot of people out there who are registered, and a lot of them are going to go through divorce and child support hearings. Are you going to sit down at every one of them? Or are you going to say, well, maybe don't sit in. Just then I will circular and say, men and women in these proceedings, if you're a counterpart, is a registered dealer, and you think he or she has lied, send us a note and we'll get them. Well, somewhere there must be behavior that, you know, should not be monitored by the NFA. But this particular behavior should be. Because? Because they were statements regarding his work as a commodity trading advisor and pool operator, and they were made in a forum, you know, where honesty is highly valued. So in this case, the weight of the evidence did show that Mr. Bronte had made false statements under oath. Is it your position that that demonstrated that he lacked the fitness, because of moral character and dishonesty, to be a licensee? That's the interpretive statement at question is, you know, very much geared towards that idea that. Where do I find that finding by the commission? I'm sorry. Perhaps I misunderstood the question. Pardon? Perhaps I misunderstood the question. I'm searching, as my colleagues are, for the reason for the commission's decision. And my question was really a batting practice pitch. My question is, did they determine that someone who would lie under oath about his activities, under his license, in order to gain something favorable in a domestic relations proceeding, demonstrated his lack of fitness because of dishonesty? Oh, yes. To serve as a licensee. Exactly. And they made a finding to that fact. I believe so. I could, if you wish, I could find what exactly they said. Mm-hmm. Forgive me for taking a few minutes. Okay. On page 17 of the order, if you want to find it. Page 17 of? Of the order. And you can find that at tab 4 in the appendix. It's the excerpts of record. For the reasons stated above, the subcommittee finds that Bronte engaged in a pattern of dishonesty. And this conduct is of a good cause to deny him registration under section 8A3M. And, you know, before that was several pages reciting the facts, what Mr. Bronte had said at his hearing, and also the evidence that NFA submitted showing that those statements were untrue. While I'm looking at the order, I would like to call your attention to the issue of mitigation. On page 18 of NFA's order, they discuss Mr. Bronte's mitigation evidence. And Mr. Bronte's counsel said that NFA just outright rejected listening to any of his evidence because he claimed he'd done no wrongdoing. If you read the paragraph regarding NFA's conclusions on mitigation, you'll see that they recited what Mr. Bronte had spoken to on mitigation and then wrote, however, Bronte's April testimony shows that he was able to answer questions in a manner calculated to help his case. And both his and Weiss's testimony indicate that he was fully capable of cooperating in the audit in October. So they first factually rejected Mr. Bronte's mitigation evidence. They did go on to say that he had, you know, claimed he had done no wrongdoing, but they first did consider the evidence and factually rejected it. So in summary, the Commission properly affirmed NFA's order revoking the registrations that Stephen Bronte advises, and the Commission asks this Court to affirm its order. Thank you. Thank you very much. Mr. Bader. Just one observation. When you look at each one of the cases that the Commission relies on with respect to we've done this before, every single one of them, Zaccarelli, Riley, Fleischman, all the ones in the brief, if you look at every single one of them, there had been a prior determination, either judicial or administrative, that some wrongful conduct had occurred. They all are prior adjudication situations. This is the first time the Commission has come in and utilized this procedure under its own interpretive standard where there has been no prior adjudication of any kind of the alleged wrongful conduct. You asked Judge Fletcher why Mr. Bronte. There is nothing in the record that would specifically indicate why they seem to have targeted Mr. Bronte. We can all speculate, but there is nothing in the record that would indicate why, but they clearly, for whatever reason, have targeted him in this particular context. Thank you. Thank you. Thank you very much. Thank you very much, both sides, for a useful argument. The case of Stephen Bronte Advisors v. Commodities Futures Trading Commission is now submitted for decision. That concludes the oral argument calendar for this morning. We are adjourned for the day. We will reconvene tomorrow morning. Thank you very much. Thank you. Thank you.
judges: Beezer, Alarcon,w. Fletcher